**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JOSEPH ROBERT LAGANA, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. PJM 17-1686 |
| WEXFORD HEALTH, | * | |
| PEGGY MAHLER, | | |
| BILL BEEMAN, | * | |
| CHRISTINE BUTLER, | | |
| DR. AVA JOUBERT, | * | |
| Defendants. | * | |

***

## MEMORANDUM OPINION

On June 20, 2017, self-represented Plaintiff Joseph Robert Lagana, presently incarcerated at the Western Correctional Institution ("WCI") in Cumberland, Maryland, filed this civil action pursuant to 42 U.S.C. § 1983 against the prison healthcare provider Wexford Health ("Wexford"), nurse practitioner Peggy Mahler, nurse supervisor Bill Beeman, medical records clerk Christine Butler, and medical director Dr. Ava Joubert (collectively, "Defendants"). ECF No. 1. He filed an amended complaint on July 7, 2017. ECF No. 4. Lagana claims that for at least the past three years, Defendants have denied him medical care and treatment, and have withheld medication for his chronic diseases, in violation of constitutional standards. ECF Nos. 1 & 4. He seeks monetary damages totaling $2.2 million[1] and an order requiring Defendants to provide him with independent treatment. ECF No. 1 at pp. 4-5.

On January 16, 2018, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 25. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.

---

[1] Lagana seeks compensatory damages of $50,000 from each individual Defendant and $500,000 from Wexford, punitive damages of $100,000 each individual Defendant and $500,000 from Wexford, and nominal damages of $25,000 from each individual Defendant and $500,000 from Wexford. ECF No. 1.

1975), the Court informed Lagana that the failure to file a response in opposition to Defendants' Motion could result in dismissal of the Complaint. ECF No. 26. On April 6, 2018, Lagana filed a self-styled Response to Opposition and Motion for Summary Judgment (ECF No. 33), which he supplemented on April 18, 2018 (ECF No. 37). On April 30, 2018, Lagana filed a Motion for Summary Judgment with Lien (ECF No. 39), which Defendants opposed (ECF No. 40). After review of the record, exhibits, and applicable law, the Court deems a hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2016). Defendants' Motion shall be construed as a Motion for Summary Judgment and shall be granted. Lagana's Motions for Summary Judgment and for Summary Judgment with Lien shall be denied.[2]

## Background

Lagana's claims arise out of the alleged actions of his prison health care providers. ECF No. 4. Specifically, he asserts that Defendant Mahler, a nurse practitioner who was assigned to monitor his treatment on a bi-weekly basis, discontinued numerous medications that had been on his treatment plan, refused to order orthotics, and refused him pain management. *Id.* at p. 2.[3] Next, Lagana alleges that Defendant Beeman delayed treatment, denied, substituted, or discontinued medication, and falsified medical documentation. *Id.* at p. 3. He claims that Defendant Butler concealed documents and "triaged then held" his sick calls and other requests, thus causing delays in treatment. *Id.* at p. 4. Lagana also alleges that Defendant Joubert routinely discontinues medication or treatment, and restarts it at a later time when his symptoms are progressively worse. *Id.* at p. 5. Lastly, he claims that Defendant Wexford has allowed its

---

[2] Also pending is Lagana's Motion for Reconsideration of the Court's December 21, 2017 order denying his Motion for Restraining Order. ECF No. 27. As judgment is being entered in Defendants' favor, Lagana's Motion for Reconsideration shall also be denied.

[3] All citations to filings refer to the pagination assigned by the Court's electronic docketing system.

untrained agents to "willfully with malice deny treatment, delay treatment and circumvent formal grievance policy," has failed to implement supervisory controls, and has failed to investigate violations of chronic care treatment contract violations. *Id.* at p. 6.

Defendants provide verified business records which include Lagana's medical records along with Joubert's and Butler's declarations. ECF Nos. 25-4 (medical records); 25-5 (Joubert Decl.); 25-6 (Butler Decl.). All of Lagana's encounters with Joubert, Mahler, and Beeman relevant to his Complaint are presented below.

Lagana has a medical history significant for bipolar disorder, general osteoarthrosis, benign prostatic hyperplasia, sinusitis, esophageal reflux, constipation, hyperlipidemia, and prostatitis. *See generally* ECF No. 25-4. On August 4, 2015, while Lagana was incarcerated at North Branch Correctional Institution ("NBCI"), Beeman updated Lagana's chart and noted that his cell had been searched and that Lagana had two brand new knee sleeves. *Id.* at p. 2. On August 6, 2015, Lagana was seen by Beeman at sick call. *Id.* at p. 3. At that time, Lagana stated that his medication was current, but was complaining that he had not received knee sleeves. *Id.* Lagana was reminded that he had refused the pair given to him and that a new pair of sleeves had been found in his cell. *Id.*

On September 21, 2015, Lagana was seen by Beeman and was given a back brace. *Id.* at p. 6.

On November 30, 2015, Lagana was seen by Beeman at sick call after complaining that he had blood in his stool. *Id.* at p. 7. Lagana was given stool cards to complete on his own. *Id.*

On February 8, 2016, Lagana was seen by Beeman at sick call. *Id.* at p. 10. Lagana complained that he had a sinus infection and right knee pain, and stated that he needed a medical

cell and medical shower.  *Id.*  At that time, Lagana was able to complete all of his ADLs[4] and was noted to have a bottom bunk order, although the provider he had last seen stated that a medical cell and shower were not medically indicated.  *Id.* at p. 11.

On June 8, 2016, Lagana was seen by Beeman to review issues raised by Lagana in a letter.  *Id.* at p. 13.  Lagana asked for a back brace and an increase in his Ultram, and was advised that such decisions were left for the medical providers.  *Id.*  Lagana was also informed that knee braces and gel insoles had been ordered but had not yet arrived.  *Id.*  Lagana requested a medical cell and was advised that there was no medical indication for a medical cell.  *Id.*  Lagana became agitated and left.  *Id.*

On August 12, 2016, a patient care conference was held.  *Id.* at p. 15.  In attendance were Lagana, Krista Bilak, N.P., the clinical pharmacist, the administrative contract coordinator, a social worker, the regional medical director, the assistant director of nursing ("ADON"), NBCI providers, the quality assurance physician, and the sergeant of the housing unit in attendance.  *Id.* A team approach plan of care was determined to include referral to behavioral health and psychiatry, visits every two weeks with the same provider for continuity of care, and an increase in Lagana's Neurontin[5] prescription to 1200 mg twice daily, in conjunction with Lagana being compliant with physical therapy.  *Id.*  Lagana was educated on the effects of pain management and the effects of chronic long term use of pain medication.  *Id.*  His Naprosyn,[6] Baclofen[7] and

---

[4] Activities of daily living.

[5] Neurontin (gabapentin) is an anti-epileptic drug, also called an anticonvulsant.  It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain.  Neurontin is used in adults to treat neuropathic pain (nerve pain).  *See* https://www.drugs.com/neurontin.html (last visited August 14, 2018).

[6] Naprosyn (naproxen) is a nonsteroidal anti-inflammatory drug (NSAID).  Naproxen works by reducing hormones that cause inflammation and pain in the body.  *See* https://www.drugs.com/naprosyn.html (last visited August 14, 2018).

[7] Baclofen is a muscle relaxer and an antispastic agent used to treat muscle symptoms, including spasm,

Neurontin were renewed.

On December 1, 2016, Lagana was seen by Holly Pierce, N.P. and the ADON for his 2-week visit. *Id.* at p. 18. Lagana had submitted no sick call slips and complained that he was told by "Angie" he "could not place sick calls as she 'holds' them." *Id.* The ADON explained that he could place them and that they are reviewed when received. *Id.* In response, Lagana stated that his legal team would take care of the problem. *Id.*

Lagana asked about the results of his hip x-ray taken on August 9, 2016, and he was advised that it revealed mild degenerative joint disease, but was otherwise normal. *Id.* Lagana then stated that he was not receiving his Visine and Capsaicin. *Id.* He was advised that Visine was not intended for long term use and that he had refused lubricating eye drops during his last visit. *Id.* Lagana agreed to the lubricating eye drops and his Capsaicin was renewed. *Id.*

Next, Lagana stated that he had not had a knee injection in 18 months. *Id.* When informed that a knee assessment was necessary, Lagana became upset, immediately jumped up, and left the room. *Id.* He was called back in order to complete a questionnaire for an upcoming MRI. *Id.* When Lagana returned, he refused a knee assessment. *Id.* Because Lagana stated that he was not wearing his knee braces, the knee braces were discontinued. *Id.*

On December 8, 2016, Lagana was transferred to WCI from NBCI, and Beeman completed the transfer summary. *Id.* at p. 20.

On December 14, 2016, Lagana was seen by Mahler for a chronic care clinic. *Id.* at p. 25. Lagana's lab result reflected a poor low/high density lipid ratio and he was offered a low fat diet, which he refused. *Id.* Lagana complained of knee pain and stated that he needed knee braces. *Id.* He was advised that the knee braces had been taken because he did not wear them, and that they would not be renewed at that time. *Id.* Lagana's February 2, 2016 right knee x-ray

---

pain, and stiffness. *See* https://www.drugs.com/baclofen.html (last visited August 14, 2018).

revealed no acute disease. *Id.* On exam, Lagana had bilateral mild knee pain with passive range of motion to 45 degrees. *Id.* There was stiffness in the right knee, no crepitus bilaterally, no swelling, no increased warmth, no skin discoloration, and no bone deformity. *Id.* He walked without a limp or any assistive devices. *Id.* His Naprosyn, Capsaicin creme, Neurontin, and Baclofen were renewed, and he was advised to continue taking Tramadol,[8] which would not expire until March 4, 2017. *Id.*

Lagana was given a renewal of his bottom bunk, back brace, non-wool blanket, and gel insoles for one year. *Id.* Lagana told medical staff at WCI that he had a medical cell at NBCI, but this was refuted by the NBCI ADON. *Id.*

Mahler noted that the MRI that had been recommended for Lagana's back was approved by collegial and would be scheduled. *Id.*

Lagana reported to WCI staff that he was not getting his eye drops and his Claritin was not helping his allergies. *Id.* The eye drops were renewed and a prescription for Nasacort was issued. *Id.*

Lagana then requested antibiotic ointment for his thumbs, but the request was declined as there were no symptoms of infection. *Id.* Instead, A & D ointment was recommended. *Id.* On December 15, 2016, Lagana's non-formulary request for Capsaicin creme and Neurontin were submitted. *Id.* at p. 31.

On December 29, 2016, Lagana was seen by Mahler at provider sick call. *Id.* at 34. Lagana complained of sore throat, nasal congestion, blood-tinged mucous, nonproductive cough, frontal headache, and sinus pain. *Id.* Lagana stated that he had a history of sinus infections and

---

[8] Tramadol is a narcotic-like pain reliever. *See* https://www.drugs.com/tramadol.html (last visited August 14, 2018).

this was his sixth infection. *Id.*  He was prescribed Augmentin,[9] Guaifenesin,[10] and Cepacol lozenges for 7 days, and was advised to take warm salt water gargles.  *Id.*

At the time of the sick call, results of Lagana's December 19, 2016 MRI were not yet available.  *Id.*  Lagana claimed at that time that he had fallen in his cell a month prior and his right hand would not close.  *Id.*  On exam, there was mild tenderness noted and Lagana could not close his right fist or flex his right wrist up or down.  *Id.*  An x-ray of the right hand was ordered.  *Id.*  Lagana asked for knee braces again and was advised that they were taken by the NBCI ADON because he had not worn them to sick call.  *Id.*  Lagana responded that there was no obligation to wear them to sick call, and Mahler informed him that she would look further into the matter.  *Id.*

On January 23, 2017, Lagana was seen by Mahler for a scheduled provider visit, at which time Lagana's MRI results were reviewed.  *Id.* at p. 38.  The impression was moderately severe central spinal stenosis[11] at L4-L5.  *Id.*  The L5-S1 degenerative disc space was narrowing with osteophyte (bone spurs) formation and disc bulge.  *Id.*  Masses in the left and right kidneys were also detected, and a CT scan with and without IV contrast, as well as an MRI with contrast, was recommended.  *Id.*  It was noted that a neurosurgery consult and a consult for an abdominal/pelvic CT with and without contrast for the bilateral renal masses was approved by collegial on January 12, 2017.  *Id.*

---

[9] Augmentin contains a combination of amoxicillin and clavulanate potassium.  Amoxicillin is an antibiotic belonging to a group of drugs called penicillins. Amoxicillin fights bacteria in the body.  *See* https://www.drugs.com/augmentin.html (last visited August 14, 2018).

[10] Guaifenesin is an expectorant.  It helps loosen congestion in the chest and throat, making it easier to cough.  *See* https://www.drugs.com/guaifenesin.html (last visited August 14, 2018).

[11] Spinal stenosis is a condition, mostly in adults 50 and older, in which the spinal canal starts to narrow. This can cause pain and other problems.  *See* https://www.webmd.com/back-pain/guide/spinal-stenosis (last visited August 14, 2018).

Lagana complained of low back pain with numbness and tingling in his legs when bearing down, with pain radiating down his legs to his feet.  *Id.*  He also stated that the pain was greater in the left leg, his right foot goes flat when walking, and he has noticed weakness in his right foot for two years.  *Id.*  Lagana was prescribed Topamax,[12] Baclofen, Neurontin, Naprosyn, Tramadol and Capsaicin creme, which were continued.  *Id.*

On January 27, 2017, Lagana was provided a pharmacy medication treatment plan.  *Id.* at p. 41.  With regard to pain medication, it was recommended that he discontinue Baclofen and Gabapentin and continue Naproxen, Tramadol, and Capsaicin.  *Id.*  For Lagana's chronic rhinitis, the recommendation was to discontinue Nasacort and start Ipratropium nasal spray.  *Id.*

On January 30, 2017, Lagana's chart was updated by Mahler.  *Id.* at p. 42.  The pharmacy medication plan recommendations were implemented except for Neurontin, which needed a tapering plan.  *Id.*  The tapering plan for Neurontin was 1200 mg twice daily for 2 days, 600 mg twice daily for 3 days, 600 mg once daily for 3 days, 600 mg every other day for four doses over 7 days, before stopping.  *Id.*  The tapering plan was discussed with Lagana and implemented on January 31, 2017.  *Id.*

On February 8, 2017, Lagana was seen by Mahler at a scheduled provider visit.  *Id.* at p. 47.  He complained of pain radiating down the right leg, right upper buttock, and right groin, and left leg weakness.  *Id.*  Lagana stated that he had an abdominal/pelvic CT at Western Maryland Hospital the week prior.  *Id.*  His medication plan was discussed and Lagana stated that he never agreed to tapering off Neurontin; however, he was advised that his Neurontin could not be renewed.  *Id.*  Lagana was also advised that custody had video of him from February 7, 2017,

---

[12] Topamax (topiramate) is a seizure medicine, also called an anticonvulsant.  Topiramate is used to treat seizures in adults and children who are at least 2 years old. Topamax is also used to prevent migraine headaches. *See* https://www.drugs.com/topamax.html (last visited August 14, 2018).

showing him walking up and down steps normally without difficulty or assistive devices. *Id.* In response, Lagana stated that the video was misinterpreted and that his back "went out yesterday, started to spasm." *Id.* Lagana was advised that he could have Tylenol 500 mg 1-2 tabs twice daily and Robaxin 500 mg as needed for a couple days. *Id.* He declined Robaxin and agreed to Tylenol. *Id.* He also requested a wheelchair, but was declined in light of the video. *Id.*

On February 15, 2017, Lagana was seen at the University of Maryland Neurosurgery Clinic, where his MRI was interpreted as mild stenosis at L4-5 and L5-S1, likely degenerative with minimal cord compression, which did not present any surgical need. *Id.* at p. 48. An MRI of the cervical spine without contrast and physical therapy for pain management were recommended. *Id.* The provider also considered steroid injections for symptom relief, but made no changes to the medication. *Id.*

On March 3, 2017, Lagana was seen by Mahler at provider sick call for multiple complaints. *Id.* at p. 52. However, Lagana did not want to be seen and signed off, "There is a pending ARP & Headquarters investigation. I do not need treatment at this time nor am I refusing any treatment. I was not scheduled this week and await the physici[an] to review my records." *Id.* He then walked out of the exam room without a limp or any assistive devices. *Id.*

On March 21, 2017, Lagana was seen by Mahler at provider sick call, at which time Lagana asked to renew his medications. *Id.* at p. 53. He complained of neck, head, back, and leg pain, and stated that he fell out of his bunk and injured a toe. *Id.* All medications were renewed, including Neurontin and Tramadol. *Id.* An x-ray of the toe was ordered. *Id.* Lagana was offered physical therapy, but he declined, stating he had four separate sessions and they told him there is nothing else they can do. *Id.* At the time of the sick call, results of Lagana's abdominal

pelvic CT were not yet available.[13]  *Id.*  A consult was placed for a cervical spine MRI without contrast.  *Id.*

On April 4, 2017, Lagana was seen by Mahler at provider sick call.  *Id.* at p. 58.  He requested shoulder and bilateral knee steroid injections and was referred to a physician provider for evaluation.  *Id.*  Lagana's aprodine and fish oil were renewed, and he was referred to optometry for replacement glasses.  *Id.*  Lagana was advised that the x-ray of his toe indicated a fracture, and he was offered buddy tape, which he declined.  *Id.*  He was referred to the orthopedist, Dr. Carls.  *Id.*  Lagana also declined laxatives for constipation, and complained that he had not been put in pain management as recommended by the neurologist.  *Id.*  Lagana was reminded that the neurology recommendations had twice been reviewed and that it did not mention outside pain management.  *Id.*

On April 7, 2017, Lagana's chart was updated to note that the consult with Dr. Carls for the toe fracture was not approved by collegial.  *Id.* at p. 62.  Instead, it was recommended that he repeat the toe x-ray in one month.  *Id.*

On April 25, 2017, Lagana was seen by Robustiano Barrera, M.D. at a scheduled provider visit.  *Id.* at p. 64.  Lagana wanted his medications renewed but was assured that they were valid through July 21, 2017.  *Id.*

On May 9, 2017, Lagana was seen by Mahler at provider sick call, at which time he asked for bilateral knee steroid injections.  *Id.* at p. 66.  Lagana also sought renewal of his existing medications and to have Baclofen added.  *Id.*  He was informed once again that the medications were valid until July 21, 2017, and Baclofen was prescribed for one month.  *Id.* Lagana then asked for outside pain management and was informed that his request was not approved by collegial, and that he was currently receiving pain management onsite.  *Id.*

---

[13] CT results later showed a large simple right kidney cyst and no abnormal mass.  ECF No. 25-4 at p. 109.

On May 23, 2017, Lagana was seen by Mahler for provider sick call. *Id.* at p. 68. His May 15, 2017 MRI of the cervical spine without contrast was reviewed and the impression was mild degenerative spondylosis with a small asymmetric disc bulge or protrusion at C5/C6 lateralizing to the right with osseous spur mildly deforming the tecal sac and in close association to the right nerve root. *Id.* There was also a slight asymmetric right neural foraminal encroachment. *Id.* Lagana was advised that he had mild arthritis and a small disc bulge with a bone spur pressing on the right nerve that may be causing pain. *Id.* He was further informed that that the MRI findings were so small that they should not be causing pain. *Id.* Lagana stated that he had a hard knot on the right lower back that gave him lightning bolt pain. *Id.* He complained that he was not being seen for his multiple sick calls and wanted to end the visit prior to being examined. *Id.*

On June 6, 2017, Lagana was seen by Joubert, the regional medical director. *Id.* at p. 70. Joubert noted that Lagana has a long history of chronic back pain, writes almost daily (sometimes 2-3 times daily) sick calls, and was seen by a medical provider every 2 weeks. *Id.* In the 2 weeks preceding the visit, Lagana submitted 14 sick call slips complaining that he was falling apart, his hands were swelling, he was physically unable to get out of bed, he was lightheaded, and he had a large bruise across his back, which was gone at the time of the visit. *Id.* Lagana presented in a wheel chair (used only in the last 48 hours due to 10/10 pain), but his exam was otherwise unremarkable. *Id.* He was assessed with spinal stenosis and bilateral kidney cysts. *Id.* Joubert spoke with Correct Rx regarding Lagana's medications and determined that Prilosec was sent on May 8, and Atrovent was sent on April 22 and would be resent. *Id.* On June 8, 2017, Joubert updated Lagana's chart to authorize a wheelchair for 30 days. *Id.* at p. 71.

On June 14, 2017, Dr. Odifie responded to Lagana's request for formulary lists of psychiatric, NSAIDs, and analgesic medications, fiber products, egg crate mattresses, pillows, and orthotics. *Id.* at p. 72. Dr. Odifie stated that there is only an analgesic formulary list; the others must be obtained from the state. *Id.* Dr. Odifie also recommended changing Lagana's Gabapentin from 800 mg twice daily to 600 mg 2 tablets, twice daily. *Id.* The change was implemented by Dr. Barrera. *Id.* at pp. 74-75.

On June 20, 2017, Lagana filed the instant lawsuit. ECF No. 1.

On June 21, 2017, Lagana was seen by Joubert at provider sick call. ECF No. 25-4 at p. 76. All 21 sick call slips submitted by Lagana since June 7, 2017 were addressed. *Id.* Lagana and Joubert agreed that the wheelchair would only be provided for long distances. *Id.* After the visit, Joubert researched why Lagana he had not been receiving Capsaicin, as he had indicated. *Id.* Joubert discovered that Lagana had refilled it nine times since March 21, 2017, and thus would be cautioned about early refills. *Id.* Capsaicin was renewed on July 3, 2017, for 120 days. *Id.* at p. 79.

On July 12, 2017, Lagana was seen by Joubert at provider sick call for 13 sick call slips, which generally centered on not receiving medications in a timely fashion, frequent falls as a result of his legs "giving out," and a skin rash with round, red lesions. *Id.* at pp. 80-82. With regard to the medications, Lagana stated that he had discussed the matter with the ARP representative the day prior and felt that it was adequately addressed. *Id.* With regard to falling, Lagana denied any significant injury and was advised to continue using the wheelchair for long distances. *Id.* He was also scheduled to see the neurosurgeon. *Id.* Lagana's lesions located in the nail beds of the hands were significantly improved with application of zinc oxide ointment. *Id.* At the time of the visit, he had flat, round, red lesions 0.5 cm in size along his arms, trunk

and legs, which were assessed as dermatitis herpetiformis.[14]  The plan was for Lagana to avoid eating wheat and peanut butter to improve the skin condition.  *Id.*  Finally, Lagana wanted to discuss chronic constipation, for which he was prescribed a higher dose of Colace.  *Id.*

On July 26, 2017, Lagana was seen by Joubert at a scheduled provider visit, at which time all 8 of Lagana's sick call slips submitted since July 14, 2017 were addressed.  *Id.* at pp. 83-85.  Lagana complained he had fallen walking to chow and was beaten and slammed to the pavement by custody, causing cuts, contusions a broken left hip and broken toe.  *Id.*  He had no bruising on examination and could use his legs to propel the wheelchair.  *Id.*  Lagana initially stated that he could not get on the exam table but when confronted that he had just been using his legs, he got onto the table.  *Id.*  Lagana used his arms to lift his legs as if they were paralyzed.  *Id.*  Lagana informed Joubert that after being beaten up by custody on July 17, 2017, he laid on the floor of his cell until July 20, 2017.  *Id.*  When Joubert gave her assessment, Lagana became upset, argumentative, and disruptive.  *Id.*  He declared that he did not need the wheelchair.  *Id.*  Joubert discussed Lagana's condition with psychiatry as his psychiatric medications had just been increased.  *Id.*  She then referred him for a follow up visit in one week to review lab work results.  *Id.*

On August 9, 2017, Joubert updated Lagana's chart to reflect that he had been called to the dispensary to address the 19 sick call slips he filed between July 27 and August 8, 2017.  *Id.* at p. 87.  Lagana's complaints involved the incident with custody a month earlier, how the dentist knows more than medical, allegations that his medications were being stolen, whether staff participated in methadone programs, sleep deprivation, and allegations that Joubert was in

---

[14] Dermatitis herpetiformis (DH, Duhring's disease) bumps and blisters resemble herpes lesions, hence the name "herpetiformis," but are NOT caused by the herpes virus.  They are caused by gluten ingestion.  *See* https://celiac.org/celiac-disease/understanding-celiac-disease-2/dermatitis-herpetiformis/ (last visited August 16, 2018).

collusion with custody regarding discontinuation of his wheelchair. *Id.* Lagana had been called to the dispensary at noon but did not arrive. *Id.* A video was obtained showing him slowly walking back and forth for about 400-500 feet for three hours, while he was supposedly en route to medical. *Id.* He did not fall during that time, and his gait was guarded but not antalgic. *Id.* Joubert noted that Lagana had been referred to behavioral health for a behavioral management plan. *Id.*

On August 24, 2017, Lagana was seen by Joubert at a scheduled provider visit to discuss 31 sick call slips, including those submitted prior to the no-show on August 9. *Id.* at pp. 89-90. Most of the complaints related to his perception of staff, while some involved allegations that he had not received medications. *Id.* A call to the pharmacy confirmed the following fill dates: 8/23 for Topamax, 8/19 for Geodon, 8/18 for Capsaicin, 8/17 for atrovent, biscodyl, loratadine, and vitamin E lotion, 8/14 for Baclofen and Gabapentin, and 8/7 for artificial tears. *Id.* When asked why he refused to go to his scheduled neurosurgeon follow up, Lagana stated that the correctional officer refused to take him because Lagana needed to go to the bathroom. *Id.* During that visit, Lagana presented in a wheelchair, propelling himself with both legs. *Id.* According to Joubert, it was clear that Lagana could walk without assistance of a wheelchair and his gait was noted to be improved at physical therapy. *Id.* Joubert added that Lagana had been diagnosed with episodic mood disorder. *Id.*

On August 25, 2017, Lagana refused to be seen by Joubert and Dr. Ashai at a scheduled provider visit to discuss polypharmacy[15] issues because "not 'everyone' was there." *Id.* at p. 91. It was Joubert's understanding that Lagana wanted a patient care conference with behavioral

---

[15] Polypharmacy is the practice of administering many different medicines especially concurrently for the treatment of a single disease; also the concurrent use of multiple medications by a patient to treat usually coexisting conditions and which may result in adverse drug interactions. *See* https://www.merriam-webster.com/dictionary/polypharmacy (last visited August 16, 2018).

health and custody involved.  *Id.*

On September 21, 2017, Dr. Odifie replied to Lagana's complaints that he was not getting his medications.  *Id.* at p. 91.  In addition to the fill dates provided on August 21, 2017, Dr. Odifie noted that nonformulary requests for vitamin B12 and Atrovent needed to be submitted.  *Id.*  Dr. Odifie suggested discontinuing fish oil due to the results of Lagana's lipid panel being normal.  *Id.*  Dr. Odifie also suggested increasing Lagana's Capsaicin prescription to four times daily.  *Id.*

On September 25, 2017, Lagana did not come to provider sick call.  *Id.* at p. 93.  Dr. Odifie's suggestions were implemented.  *Id.*

On September 29, 2017, Lagana was seen by N.P. McLaughlin at provider sick call, in response to Lagana's numerous requests.  *Id.* at p. 96.  Lagana arrived with a slow gait, dragging his right leg, but was able to get up on the exam table.  *Id.*  He had positive straight leg test[16] bilaterally and complained of severe, generalized pain criss-crossing his body.  *Id.*  Lagana stated that he did not want to try steroid injections and did not want major surgery.  *Id.*  He complained that his left hand was constantly numb and that his right hand was painful and sometimes swollen.  *Id.*  A splint was ordered for the right hand.  *Id.*  Lagana continued to complain of the open sores popping up all over his body, but his gastric reflux was improving.  *Id.*  Lagana's medications were renewed.  *Id.*

On October 20, 2017, Lagana was seen by N.P. McLaughlin at a scheduled provider visit, at which time he complained that he had not received a right wrist x-ray.  *Id.* at p. 103.  During the visit, Lagana was observed bending his wrist and fingers with a full range of motion.  *Id.*  His wrist x-ray was confirmed for the following week, and he was advised that his appointment with

---

[16] Lasègue's test, or the straight leg raising test, is a clinical test to demonstrate lumbosacral radicular irritation. It. is said to be positive if the angle to which the leg can be raised (upon straight leg raising) before eliciting pain is <45°.  *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5483767/ (last visited August 16, 2018).

the neurosurgeon was rescheduled and that he should attend. *Id.*

Lagana was transferred back to NBCI, and on November 6, 2017, he attended a patient care conference regarding polypharmacy and access to medication and a wheelchair. *Id.* at p. 105. In attendance were representatives from custody, psychiatry, psychology, and pharmacy, and Dr. Joubert. *Id.* Custody reported that Lagana originally came out of his cell in a standing position that day, then changed his posture and bent over when he noticed the patient care conference team coming towards him. *Id.* Lagana refused to sit down during the 20-minute encounter and stood on his right foot with the left leg crossed over. *Id.* Lagana's polypharmacy issues were discussed and the pharmacist indicated that she would sit down with him one-on-one to review his medications. *Id.* Lagana's wheelchair issues were also discussed, and it was determined that he was getting all of his medications as prescribed. *Id.* Psychiatry did not recommend any changes. *Id.*

On November 13, 2017, Lagana was seen by Regina Lease, R.N. for complaints of his open sore rash. *Id.* at p. 107. For that visit, he arrived with an obvious limp and had to be assisted by custody on and off the exam table. *Id.* Lagana was advised not to pick on the lumps from his rash, was provided Triple Antibiotic Ointment, and was referred to a provider. *Id.*

According to Joubert, Lagana continues to be monitored regularly by medical personnel for his chronic conditions. ECF No. 25-5 ¶14. Lagana also continues to have access to more immediate medical care though use of the sick call process. *Id.*

## Standard of Review

### I.     Motion to Dismiss

In reviewing a complaint in light of a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all well-pleaded allegations of the complaint as true and construes the facts and

reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005); *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), unsupported legal conclusions, *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), and conclusory factual allegations devoid of any reference to actual events, do not suffice, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## II. Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The court reviewing the motion must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

## Analysis

Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(6), or summary judgment under Rule 56. ECF No. 25. In support, Defendants argue that (1) Lagana has not stated any cause of action pursuant to § 1983; (2) Defendants are entitled to judgment as a matter of law; (3) Lagana does not allege facts sufficient to support a claim for punitive damages; and (4) Lagana is not entitled to injunctive relief. ECF No. 25-3.

### I.       Wexford's Liability

As a threshold matter, it is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Md. Dep't*

*of Pub. Safety & Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009). To the extent that Lagana seeks to hold Wexford liable based on supervisory liability, he fails to identify in his pleadings a Wexford policy or procedure that proximately caused a violation of his rights. *See Monnell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Accordingly, the claims against Wexford must be dismissed. *See Love-Lane*, 355 F.3d at 782. The Court will further examine whether the record supports a finding that the individual Defendants failed to provide adequate medical treatment for Lagana's conditions.

## II.      Denial of Medical Care

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994). "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also*

19

*Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178 (citations omitted). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer*, 511 U.S. at 844. "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178. Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citation and internal quotation marks omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Further, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977).

Here, there is no evidence that Defendants were deliberately indifferent to Lagana's serious medical needs or that his medical conditions were ignored. Lagana's medical records for the three years preceding the filing of his Complaint indicate that he was seen by medical staff, either for scheduled visits or sick calls, at least 28 times. During those visits, the medical staff often reviewed his medication and attempted to address his numerous complaints. Contrary to Lagana's assertions, nothing in the record suggests that medication or treatment was substituted or discontinued without notice or cause, or that treatment of his symptoms was purposefully

delayed. In the two months following Lagana's filing of the Complaint, he submitted 73 sick calls, and his complaints were addressed over the course of four visits. It appears that even until now, Lagana continues to be monitored regularly by medical personnel for his chronic conditions and he has access to the sick call process.

Moreover, an Eighth Amendment claim is not presented where, as here, Lagana alleges that Defendants have not provided the exact medical treatment that he desires. As previously indicated, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir.1970)). In this case, there are no exceptional circumstances because as previously explained, Lagana's medical condition has been closely monitored by Defendants for at least the past three years, and his treatment plan has been adjusted accordingly. To the extent there were delays in treating any of Lagana's chronic pain, those delays were necessary so that needed medical tests and imaging could be obtained for proper medical treatment. Lagana himself is also responsible for some delay based on his refusal to attend some of the appointments scheduled. In any event, the delays were not occasioned by a reckless disregard for Lagana's suffering.

In light of the undisputed facts, Lagana cannot prevail on his claims and summary judgment in favor of Defendants is appropriate.

### III.    Punitive Damages

Punitive damages are allowed in an action under § 1983 when the defendant's conduct is shown to be "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *See Smith v. Wade*, 461 U.S. 30, 56 (1983). There is no evidence on the face of the Complaint, and Lagana has offered none in

rebuttal to Defendants' Motion, that the conduct alleged was the result of reckless or callous indifference to Lagana's federally protected rights. As such, Plaintiff is not entitled to punitive damages.

**IV.    Injunctive Relief**

To the extent that Lagana seeks an order providing him independent treatment, he seeks injunctive relief. *See* ECF No. 1. A preliminary injunction is an "extraordinary and drastic remedy." *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain a preliminary injunction, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at, 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)). Lagana fails to demonstrate that he is likely to succeed on the merits or that he is likely to suffer irreparable harm absent preliminary injunctive relief from this Court. From the medical records and the declarations under oath pertaining to his care, it is clear that Lagana is receiving medical attention for his complaints, although it may not be the exact treatment he requests. Injunctive relief is thus not appropriate under these circumstances.

**Conclusion**

The Court determines that no genuine issue as to any material fact is presented and Defendants are entitled to a judgment as a matter of law.  Summary judgment shall be entered in favor of Defendants by separate Order.


_____/s/_____
PETER J. MESSITTE
August 20, 2018                          UNITED STATES DISTRICT JUDGE